## BEGGARLY *vs.* CRAFT.

1. Where the damages are excessive, resulting probably from the fact that the whole Law of the case has not been presented so full to the Jury as it should have been, a new trial will be ordered.

2. Where unchastity is imputed to a female, evidence of actual prostitution, two months after the speaking of the words, is not admissible.

Complaint, in Fulton Superior Court. Tried before Judge BULL, at the April Term, 1860.

This was an action, brought by Josephine F. Craft, through her father and next friend, George W. Craft, against Clark Beggarly, to recover damages which the plaintiff alleged that she had sustained in consequence of the falsely and mali-

ciously speaking by the defendant of the plaintiff, the following words, to wit: "She is a girl of bad character; she is a whore; I believe her to be a whore; she keeps the same kind of company that such women keep."

The action was brought in the short form, and the petition conformed to the form prescribed in the statute, without *innuendo* or *colloquium*.

The defendant pleaded that, if he ever spoke the words as charged, he did so in an effort to have the plaintiff removed from the house in which she then resided, and which was in the immediate neighborhood of the house in which defendant and his family resided; that he had been informed that plaintiff's conduct had been such as to indicate a want of chasity, and that her character for chastity was not good; that her associations were not good, and her house was a place of resort at late and unusual hours of the night for men; and that in August, 1857, she had carnal connection and sexual intercourse with one F. M. Cranford, who was not her husband.

It appeared from the evidence adduced on the trial, that the defendant, in the spring of 1857, and prior to the commencement of the action, applied to the owner of the house in which plaintiff and her father lived, and also to the agent of such owner who rented the house to plaintiff's father, to have them removed from said house, which was in close proximity to the house in which the defendant with his wife and one child resided; that defendant seemed to be in an angry mood, and a violent passion, when he made the application and complaint, and was very abusive of the plaintiff; that, on that occasion, the defendant said he believed the whole family to be whores, and the plaintiff a damned whore, and he could prove it; that the whole object of defendant seemed to be to get them away from the house in which they then lived, so near to his family.

There was some conflict in the testimony as to the general character of the plaintiff, both in Milledgeville, where she once lived, and in Atlanta, where she then lived. Some of the witnesses testified that she was lightly spoken of, and that common rumor gave her the character of a bold, fast, imprudent, forward and suspicious girl; that she was often seen on the streets and public walks of Milledgeville, unattended, at times when virtuous ladies usually go attended;

Beggarly vs. Craft.

that her general deportment indicated but little self-restraint or self-respect; that she seemed to have been loosely raised, and to be under little, or no family or parental restraint; that her general bearing and carriage were unbecoming a chaste, pure-minded girl, and tended to invite the advances of young men; that she was seen to pass about the passenger depot in Atlanta as late as 9 or 10 o'clock at night, in company with a negro woman, known by the name of Lucy Dean, who was at the time hired to her father; that the character of the negro woman for virtue was notoriously bad; that, on one occasion, the negro woman and the plaintiff were passing through the depot and stopped near the Ladies' Saloon, when the negro woman left plaintiff by herself and went off up to the far end of the depot to where some young men were standing; that one of the young men returned with the negro to where the plaintiff was, and the three went off down the road in the direction of the house in which plaintiff lived; that this occurred in the spring of 1857, and between 9 and 10 o'clock at night; that, on another occasion, in June, 1857, a gentleman called at the house of plaintiff's father, when plaintiff rose up from her seat and embraced him affectionately, and when she discovered who it was, she relaxed her embraces and asked to be forgiven, as he was not the man she was looking for, that she was looking for a gentleman from the Washington Hall.

Other witnesses testified: That they had known the plaintiff for some time, and that her character for virtue was good, and her associations reputable, and that until this suit was instituted. they had never heard anything against her character; that some of the witnesses had lived very near to her father, and had an opportunity of seeing her often, and that her general reputation was that of a chaste and virtuous girl.

Pending the trial, counsel for defendant proposed to read the answers of F. M. Cranford to interrogatories taken out in said case, which answers were as follows, to wit:

"I do know of one person who had sexual intercourse with plaintiff in the months of August and September of 1857, in Atlanta, Georgia, and within about ten feet of the defendant's lot, and on the lot whereon the plaintiff lived, and that person was the witness; I am fully satisfied that plaintiff received other company for improper purposes during the time

that I was visiting her, from what she told me, and I regarded her as a prostitute, and ready to receive men at all times for improper purposes, as my first proposition was made for her meeting me, through a negro woman she had hired, and the plaintiff accepted the proposition and met me through an agreement of that kind for the purposes already stated."

These answers were objected to by counsel for plaintiff, on the ground that they detailed occurrences happening after the suit was instituted, and after the speaking of the slanderous words by the defendant, which objection was sustained by the Court and the evidence repelled, and defendant excepted.

The presiding judge charged the jury, amongst other things:

"That the words declared on were actionable *per se,* and upon proof that the same were spoken by the defendant, of and concerning the plaintiff, the plaintiff was *prima facie* entitled to recover, as upon proof of the speaking of words, actionable in themselves (as the words charged in this case are), the law presumes malice, and no special damage need be proven." To which charge defendant excepted.

The jury returned a verdict for the plaintiff "for four thousand two hundred and fifty dollars, with cost of suit."

Counsel for the defendant moved for a new trial of said case, on the following grounds:

1. Because the Court erred in deciding and holding that the defendant could not justify, in said case, by proving any specific act of sexual intercourse by the plaintiff, but that evidence of general bad character for virtue and chastity were alone admissible for that purpose.

2. Because the Court erred in ruling out the answers and testimony of F. M. Crawford, as aforesaid.

3. Because the Court erred in charging the jury as hereinbefore set forth.

4. Because the verdict was without evidence, strongly against the weight of evidence, and contrary to law.

5. Because the damages found by the jury were excessive.

The Court overruled the motion, and refused the new trial, and defendant excepted.

Counsel for defendant then moved to arrest the judgment in said case, on the following grounds:

1st. Because it is apparent on the face of plaintiff's de-

claration, that no legal cause for action is set forth therein against the defendant.

2d. Because the words charged to have been spoken by defendant impute no crime to the plaintiff, and no special damage is averred to have been suffered by her on account of the speaking thereof.

The Court overruled the motion and refused to arrest the judgment; and these decisions, refusing the new trial and to arrest the judgment, constitute the errors complained of in this case.

BLECKLEY, for the plaintiff in error.

G. B. HAYGOOD, for the defendant in error.

*By the Court.*—LUMPKIN, J., delivering the opinion.

After much reflection upon this case, and an earnest effort to arrest its further agitation, we are forced to the conclusion that the damages found by the jury are excessive, and that on that account the verdict and judgment ought not to stand. There are circumstances, independently of the pecuniary condition of the defendant, which, in our judgment, ought to mitigate the finding of the jury.

It is true, we can not hold the defendant excusable for uttering the defamatory words which he did, and in the intemperate language employed by him. Still, if the jury believed that he was actuated alone from a desire to protect his family from an unworthy neighbor, and from no malice toward the plaintiff, it should have weighed much with them in the assessment of damages. And can any one read the evidence and doubt that this was the motive which influenced the defendant? No other cause is assigned or insinuated. And to whom were the words spoken? To Mr. W. H. Harvel, who rented the lot to the Craft family, and to Mr. S. J. Shackelford, his agent. He complained to them of these people, and insisted upon their removal; and both Shackelford and Harvel testify that the whole object of Beggarly seemed to be to get them away. To show conclusively the motive that prompted the defendant, and at the same time the earnestness and strength of his convictions, he said in the violence of his passion, that if Harvel and Shackelford

did not remove the Crafts, they were as bad as they were. We grant that such words are wholly unjustifiable; still they indicate anything but the slimy tongue of a slanderer.

And then it is altogether worthy of remark, that to no other human being did the defendant ever repeat this charge. The words were spoken in a strictly business transaction—though in a most indecorus and intemperate manner. The law, if it can not forgive always, looks with indulgence upon such communications.

This view of the case did not have its due weight. It was not as permanently presented by the Court as it should have been. His honor was right in holding that the words spoken being actionable in themselves, upon proof of their being spoken, the law would infer malice; and that the plaintiff was entitled to recover, without alleging or proving any special damage.

But the same witnesses, be it borne in mind—Harvel and Shackelford—who proved the speaking of the words, testify also to the occasion on which, and the circumstances under which, they were spoken. Here, then, the antidote, to some extent, accompanied the poison, and both in the eye of the law and of reason, should have been taken into the account.

The plaintiff came from Milledgeville to Atlanta, at the age of fifteen. And while there is respectable testimony in the record, from persons who lived near her in Milledgeville, and with whose families she associated at home and in the Sunday-school, that they, the witnesses, never saw anything improper in her conduct or heard anything disreputable to her character, there is contradictory evidence upon this point. A number of persons, mostly young men, speak of her as a bold, fast and forward girl of doubtful or suspicious character, and inviting, in her deportment, to the advances of young men. And while they impute to her no act of prostitution, they say her general reputation and conduct were not very good—rude and unbecoming a respectable young girl.

And then, after coming to Atlanta, there are facts, sworn to, which corroborate the impressions she made in Milledgeville. She was seen about the depot at unseasonable hours, in company with a negro woman hired by her father, by the name of Lucy, of notoriously infamous character. At one time, between nine and ten o'clock at night, this woman left the plaintiff and approaching to where a group of young men

Beggarly vs. Craft.

were standing, conversed with them, when one of the company joined the girl and when the two and the negro walked off together.

It is quite certain that the defendant either heard or saw things which alarmed his fears and justified him, as he supposed, in denouncing this young woman as unfitting to reside so near his family. He may have judged her too harshly. The proof did not justify his accusation. Under all the circumstances, it may have been right in compelling him to answer in damages, but the verdict can not be justified by the facts of the case.

If parents will permit their daughters to grow up without restraint—to play the wanton in the streets and public places of the city—even if they escape actual pollution, they are not entitled to the same compensation as should be awarded to the modest maiden, who, should ever an impure thought intrude itself, would crimson her cheek with a burning blush, though alone in the solitude of her chamber, and concealed from mortal eye by the deep shades of midnight. This would be to confound all distinction between the pure and the impure.

Slander verdicts, however enormous, can not preserve the reputation of our daughters, if we suffer them to grow up without domestic restraint; nor will the Founder of families hold such parents guiltless. Governments may enact salutary laws, the ministry may thunder weekly from their pulpits the lessons of the law, Courts may execute judgment in righteousness, but, unless family discipline be enforced, all other efforts will be in vain, to save the rising generation from ruin and wretchedness, and the land from destruction. Where, amongst us, are the representatives of the women—aye, and the men, too, of the olden time? And yet, to these hothouse plants, with all their immaturity of body and mind, are soon to be committed the destinies of this migthy nation! Who does not tremble in view of this fact?

We repeat, then, had the breath of slander never whispered a reproach against the name of the plaintiff—were she chaste as Diana—unsullied as the snowdrift—were her thoughts as pure as those of the Pilgrim devotee while imprinting a kiss upon his favorite saint—the damages would have been too large, especially considering that the defendant was unable by reason of his poverty, to give security on

the appeal in this case, or to prosecute this writ of error to this Court.

We think the Court was right in rejecting the plea and proof of actual prostitution, two months after the words were spoken. Whether offered in order to draw the inference, that, if the plaintiff was actually unchaste in August, she was probably not free from the taint of pollution in June, or to diminish the damages on account of the degradation to which the witness swore she subsequently yielded, we hold, it would be dangerous in the extreme to allow such proof. The charge made was well calculated to stimulate assaults upon the virtue of a young woman, however innocent she might be in her deportment, and then it would become the interest of the defendant to conspire to bring about the result which he imputed. No authority is produced in support of this attempt, and policy forbids the allowance of such testimony.

## JUDGMENT.

Whereupon, it is considered and adjudged by the Court, that the judgment of the Court below be reversed, upon the ground that the Court erred in not granting a new trial in this case, on the ground that the damages found by the jury were execssive.